IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE L. WOITASZEWSKI,<br><br>Defendant. | 8:21CR8<br><br>FINDINGS AND RECOMMENDATION |

This matter is before the Court on Defendant Katherine Woitaszewski's Motion to Suppress. ([Filing No. 22](#).)  An evidentiary hearing was held on November 8, 2021.  A transcript has been filed and this matter is now ripe for disposition.  For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

Detective Mike Sundermeier ("Detective Sundermeier") of the Omaha Police Department was involved in an investigation involving Defendant. (TR. 7.) Detective Sundermeier had arrested an individual named Danny Rojas ("Rojas") who had been in contact with Defendant.  (TR. 7.) Rojas was involved in drug trafficking and Detective Sundermeier had information that Defendant was also involved in drug activity.  (TR. 7.)  Detective Sundermeier gained information Defendant was involved in the sale of methamphetamine through jail calls and a phone search warrant.  (Ex. 1.)

In August, 2020, in an effort to find Defendant, Detective Sundermeier obtained ping warrants to track two of Defendant's cell phones. (TR. 7-8.) Detective Sundermeier identified Defendant's cell phones through an examination of text messages on Rojas' phone.  (TR. 21-22.)

Detective Sundermeier testified Defendant identified herself by name on those messages. (TR. 22.) Detective Sundermeier then sent subpoenas to cell phone companies who identified the cell phones as belonging to Defendant. (TR. 22.) Detective Sundermeier testified Defendant had used at least one of those phones in police reports in the past. (TR. 22.)

Once Detective Sundermeier obtained ping warrants, he learned Defendant was a convicted felon. (TR. 8.) Detective Sundermeier testified that at the time he obtained the ping warrants, he believed Defendant had a misdemeanor warrant, but after the ping warrants were obtained, he discovered Defendant had a felony warrant issued for her arrest. (TR. 8.) Detective Sundermeier testified he learned Defendant had a felony warrant issued on September 10, 2021 out of Saunders County for a DUI offense. (TR. 11.) Detective Sundermeier called Saunders County to verify that the warrant was active and that Saunders County would extradite Defendant. (TR. 11.) Detective Sundermeier testified it was important for him to verify if there was an extraditable felony warrant because he intended to contact Defendant and arrest her based on the arrest warrant. (TR. 12.)

On September 18, 2020, the pings for Defendant's cell phones indicated Defendant was in the area of the Home Towne Lodge at 10308 Sapp Brother's Drive in Sarpy County, Nebraska. (TR. 9.) The Home Towne Lodge is a motel with an exterior walkway leading to all the doors. (TR. 12-13; Ex. 3.) Detective Sundermeier testified that there is a radius on the pings, and that the pings showed Defendant was within the radius of the motel and there were no other hotels in that area. (TR. 9.) Detective Sundermeier testified that although he checked the ping data on September 18th, he cannot recall the width of the radius because the radius varies. (TR. 23.) Detective Sundermeier testified it could go down to sixteen meters or lower or it could go up to several hundred meters. (TR. 23.)

On September 18, 2021, at approximately 8:00 or 9:00 a.m., Detective Sundermeier went to the Home Town Lodge to serve the arrest warrant. (TR. 25.) Detective Sundermeier observed a 2000 Ford F250 truck in the parking lot that he had reason to believe was used by Defendant. (TR. 9-10; Ex. 1.) Detective Sundermeier testified he believed Defendant was associated with the truck because he knew Defendant liked to drive large pickups and because he had seen that vehicle there on multiple occasions while the ping for Defendant's phones was showing in that location. (TR. 10.) Detective Sundermeier explained that prior to September 18th, he had conducted surveillance at that location and observed the truck. (TR. 10.)

During the period of surveillance, license plates were, at one point, not displayed on the truck. (TR. 23.) However, later in the surveillance, plates were on the vehicle. (TR. 23.) When the plates were checked, they did not come back as being registered to the vehicle. (TR. 22-23.) A check of the VIN of the truck showed it had been reported stolen from Council Bluffs, Iowa. (Ex. 1.) Detective Sundermeier acknowledged that although he had observed a female driving the truck on one occasion, he had been unable to identify the female. (TR. 22.) Detective Sundermeier testified that he did not know for certain that the truck belonged to Defendant until he got to the motel. (TR. 23.)

When they arrived at the motel, officers contacted the motel's desk staff. (TR. 11.) Deputy David Coombs ("Deputy Coombs") with the Sarpy County Fugitive Task Force asked the staff if they knew anyone named Katherine Woitaszewski and if she was staying there. (TR. 11; TR. 29.) Deputy Coombs had a photograph of Defendant and showed it to the desk staff. (TR. 11; TR. 29.) Deputy Coombs testified the desk staff did not identify Defendant by name but recognized her in the photograph. (TR. 39.) Detective Sundermeier testified that the desk staff said Defendant was staying in room 234 and had used an ID with the name "Cady Glaser" with an address of 9506 Holmes Plaza Apt. A11, to check into the room. (TR. 11; TR. 25; Ex. 1.) The desk staff told the officers that they were planning to evict Defendant that morning due to issues with her showing multiple ID's and using different names while renting rooms. (TR. 12; TR. 31; Ex. 1.) The desk staff provided the officers with the paperwork for the room, but Defendant's name was not on it. (TR. 25.) Detective Sundermeier testified he believes only one name was listed on the paperwork. (TR. 25.) The hotel manager identified the truck observed in the parking lot as belonging to Defendant. (Ex. 1.) The desk staff then provided the officers a key to room 234. (TR. 12.) Room 234 is located on the second floor of the motel and the door to access the room is on the exterior walkway. (TR. 13.)

After receiving the key, officers, including Detective Sundermeier and Deputy Coombs, went to the room and knocked on the door for one minute. (TR. 13-14; TR. 41; Ex. 1.) Detective Coombs testified he attempted to look inside the motel room through the room's exterior window but could not see anyone inside. (TR. 41.) Deputy Coombs stated he believed Defendant was in the room because desk staff indicated Defendant had made complaints about problems with the room and indicated she wanted to change rooms, which led him to believe desk staff had been in

3

recent contact with her. (TR. 39.) Deputy Coombs testified desk staff did not directly state Defendant was in the room at the time. (TR. 40.) Detective Sundermeier testified he thought Defendant was in the room based on his conversation with desk staff and because it was early in the morning. (TR. 25.) He also suspected she was in the room because he believed she had spent the night there due to her phones staying in that location. (TR. 25.)

Following their knock on the door, when officers did not hear anyone moving in the room and did not receive a response at the door, Detective Sundermeier unlocked the door using the key and announced police. (TR. 13; Ex. 1.) Deputy Coombs testified that he announced himself while standing in the doorway after the door was unlocked. (TR. 40.) Once the door was open, Detective Sundermeier testified he observed that room 234 had two beds to the right of the door; a television and dresser to the left of the door; and then straight back from the door was a bathroom and closet area. (TR. 13; Exs. 4-6.) The closet area did not have a door, but there was a wall between the door and the clothing rack area that an individual could hide behind. (TR. 27; Exs. 4-5.) Detective Sundermeier testified he could not see the corner of that area from the doorway, but he could see it once he entered the room. (TR. 28.)

Detective Sundermeier stated that after he opened the door, he also saw a male standing near one of the beds. (TR. 13.) The officers called over to the male, later identified as Aaron Neumann ("Neumann"), and directed him to step outside. (TR. 13; Ex. 1.) Neumann exited the room voluntarily. (TR. 43.) Officers then observed Defendant emerge from the bathroom. (TR. 13.) Officers called Defendant over and she came into the hallway. (TR. 43.) Defendant was then placed in handcuffs and placed under arrest for the warrant. (TR. 14; TR. 26; TR. 43.) Detective Sundermeier stated he could not see the bathroom when Defendant was placed in custody. (TR. 28.) Deputy Coombs also testified he could not see into the bathroom from the front door of the room and that he did not know at the time if Defendant was the only occupant of the bathroom. (TR. 45.)

Detective Sundermeier stated that once Neumann and Defendant were out of the room, officers "cleared" or conducted a protective sweep of the room to make sure no other people were in the room. (TR. 14.) Detective Sundermeier stated that to clear the room, officers check all areas large enough to conceal a person. (TR. 14.) Deputy Coombs testified the purpose of a protective sweep is to make sure there are no additional hidden parties that pose a danger to officers

on scene. (TR. 36.) Deputy Coombs testified protective sweeps are done as a matter of course. (TR. 45.) Detective Sundermeier stated that because they were conducting a protective sweep, they were not searching for items. (TR. 15.)

Deputy Coombs testified that while he was conducting the protective sweep, he observed a safe located at the back of the room to the left-hand side of the wall. (TR. 36; Exs. 7-8.) The safe was under a clothing rack. (TR. 26.) Deputy Coombs testified the door of the safe was ajar—it was not completely open or closed, but open far enough to see the contents inside. (TR. 37.) Deputy Coombs estimated that the door was open approximately three inches. (TR. 37.) Deputy Coombs stated at his first glance, he saw what he believed to be a methamphetamine pipe in the safe. (TR. 37.) He then stooped down to look deeper in the safe and he saw a handgun in the safe behind the pipe. (TR. 37.) Deputy Coombs testified he did not have to manipulate the door of the safe to see inside and did not touch the safe during the protective sweep. (TR. 37; TR. 44.) During the sweep, Deputy Coombs also observed a Nebraska ID card for Cady Glazer in the toilet that had not been flushed successfully. (Ex. 1.) Deputy Coombs told Detective Sundermeier he observed a methamphetamine pipe and firearm in the safe. (TR. 15; TR. 37.)

Once the protective sweep was completed and no other people were found in the room, everyone left the room and stood in the hallway. (TR. 15.) The door to the room was left open. (TR. 16.) Officers asked Defendant for consent to search the room due to the firearm being observed inside. (Ex. 1.) Defendant denied putting anything in the safe and would not consent to a search. (Ex. 1.) Once the room was cleared, and consent to search was denied, the room was not searched. (TR. 16.)

Detective Sundermeier testified he then contacted Sarpy County Office Jerry Brisky ("Officer Brisky") who responded to the scene. (TR. 15.) Detective Sundermeier stated he contacted Officer Brisky because he knew Defendant was a prohibited person from possessing a firearm and officers had observed a firearm and drug paraphernalia in the motel room and believed additional contraband could be in the room. (TR. 15.) Detective Sundermeier wanted Officer Brisky to assist him with drafting and obtaining a search warrant for the room, which Officer Brisky did. (TR. 15-17.)

While officers were seeking the search warrant, Detective Sundermeier discovered through further investigation that Defendant was on probation for an out-of-state conviction. (TR. 17.)

5

Detective Sundermeier contacted Defendant's Nebraska probation officer to inquire about Defendant's probation status. (TR. 17.) Detective Sundermeier learned Defendant was convicted in Pottawattamie County, Iowa for felony possession with intent to deliver methamphetamine on November 21, 2019 and was sentenced to three years' probation. (TR. 17; Ex. 1.) Defendant had a search clause as a condition of that probation and was not allowed to possess firearms. (TR. 17; Ex. 1.) Detective Sundermeier testified that the search clause provided that a probation officer or any law enforcement officer could conduct a search of Defendant's person or location where she was residing. (TR. 17.) The probation officer gave officers authorization to search the motel room, where Defendant was apparently residing. (TR. 17-18; Exs. 4-6.)

Based on the affidavit, a Sarpy County judge issued a warrant for a search of the room. (TR. 19; Ex. 1.) Detective Sundermeier testified that the affidavit for the search warrant includes all relevant investigative steps officers took prior to getting authorization to search the motel room. (TR. 19; Ex. 1.) Once the warrant was authorized, officers searched the room. (TR. 19; Ex. 1.) Officers located a small amount of methamphetamine, another controlled substance, the methamphetamine pipe in the safe, and the firearm in the safe. (TR. 19-20.) Detective Sundermeier testified that following the search, Detective Perna completed an inventory receipt for the search of the room. (TR. 20-21; Ex. 2.) The inventory receipt indicates it was from the Omaha Police Department even though this was a search that occurred in Sarpy County. (Tr. 19-20; Ex. 2.) Detective Sundermeier testified it was from the Omaha Police Department because the Omaha Police Department took the property and booked it into evidence. (TR. 21.)

## DISCUSSION

Defendant claims the items seized from the motel room are the product of an illegal execution of an arrest warrant and an illegal search. Defendant argues officers' entry into the motel room was not justified by the arrest warrant because at the time officers approached the room, they did not know Defendant was inside the room. Defendant further asserts the room was unlawfully searched after she was taken into custody because any justification the officers had for searching the room ended when she was taken into the hallway and placed under arrest. The undersigned disagrees.

6

Defendant's constitutional rights were not violated when officers went to the motel room to execute the arrest warrant. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). An officers' assessment of whether a suspect is within a dwelling does not have to be correct; "rather, they need only reasonably believe that the suspect resides at the dwelling to be searched and is currently present at the dwelling." *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996).

The officers had a reasonable belief that Defendant had rented, and was presently occupying, the motel room. Officers had a ping warrant that was showing that Defendant's phones were located at or around the motel. When officers arrived at the motel on the morning of September 18th, Detective Sundermeier observed a truck in the parking lot that he believed belonged to Defendant based on his earlier investigation into Defendant. Detective Sundermeier testified he believed Defendant was associated with the truck because he knew Defendant liked to drive large pickups and because he had seen that vehicle there on multiple occasions while the ping was showing in that location. The desk staff at the motel recognized Defendant from a photograph and told officers Defendant was staying in room 234. The hotel manager also told officers that the truck in the parking lot belonged to Defendant. Officers believed Defendant was present in the room based on statements made by the motel staff and because it was early in the morning. Defendant had complained about issues with her room and the ping data indicated Defendant's phones had been in that location overnight. Taken together, this evidence was sufficient for officers to reasonably believe Defendant was the renter of room 234 and was present in the room at that time. Therefore, the arrest warrant justified the officers' presence at the motel and their entry into the motel room. Defendant was lawfully arrested on the outstanding warrant.

Further, officers' entry into the motel room to conduct a protective sweep after Defendant was in the hallway and placed in custody was lawful. Officers may make a warrantless protective sweep in conjunction with an arrest where they reasonably believe the area inspected could harbor individuals who pose a danger to the officer or others. *Maryland v. Buie*, 494 U.S. 325, 337 (1990). Here, officers suspected Defendant was involved in drug transactions, which could potentially involve dangerous activity. *See Bailey v. United States*, 568 U.S. 186, 194 (2013) (stating that

7

"the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence") (quotation omitted). When officers opened the door to the motel room, they initially did not see Defendant. She emerged from the bathroom after officers observed Neumann in the room. Detective Sundermeier testified he could not see the bathroom when Defendant was placed into custody. Deputy Coombs also testified he could not see into the bathroom from the front door of the room and that he did not know at the time if Defendant was the only occupant of the bathroom. Based on this evidence, the undersigned finds the officers had a reasonable belief that individuals who posed a threat to the officers could be hiding in the motel room. Therefore, the protective sweep of the room was permissible.

The undersigned further finds the methamphetamine pipe and firearm in the safe were in plain view. "During a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is immediately apparent." *United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009). *See also United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010) ("[O]fficers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object"). However, a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335.

Detective Coombs testified that when he entered the motel room to conduct the protective sweep, he observed a safe with its door ajar in the back of the room to the left-hand side of the wall. The door to the safe was open approximately three inches and Detective Coombs was able to see inside the safe and what appeared to be a methamphetamine pipe. Although Detective Coombs testified he did not see the firearm until he stooped down to look deeper inside the safe, this does not render the firearm not in plain view. *See James v. United States,* 418 F.2d 1150, 1151 n. 1 (D.C. Cir. 1969) (stating that the fact that "the policeman may have to crane his neck, or bend over, or squat, does not render the [plain view] doctrine inapplicable, so long as what he saw would have been visible to any curious passerby"); *United States v. Elkins*, 300 F.3d 638, 654 (6th Cir. 2002) (stating that "[a]ny contortions [the officer] made to peer through the opening did not change the plain view character of his observation"); *United States v. Terry,* 702 F.2d 299, 319 (2d Cir. 1983) (finding that a scale was lawfully seized where DEA agent "had to walk over to the box and look into it before determining that the box contained a scale"). Detective Coombs did not

8

manipulate the safe to see inside and did not touch the safe at any point. Further, due to its character, it was immediately apparent that the methamphetamine pipe was incriminating in nature. Likewise, at the time the officers conducted the sweep, they knew Defendant was wanted on a felony warrant and was a convicted felon. (TR. 8.) This reasonably supported the conclusion that the firearm was also incriminating in character. Based on this evidence, the undersigned finds the methamphetamine pipe and firearm were in plain view.

Because the methamphetamine pipe and firearm were discovered in plain view during a valid protective sweep, this evidence is admissible and "it was appropriate for the officers to add a description of this evidence to the search warrant affidavit." *United States v. Garcia-Delacruz*, No. 4:06CR3016, 2006 WL 3538948, at *3 (D. Neb. Dec. 7, 2006). *See also United States v. Smith*, No. 8:05CR422, 2006 WL 994636, at *13 (D. Neb. Apr. 12, 2006) (stating that because the officers would have been justified in seizing the evidence found in plain view during a protective sweep, it was proper to note the existence of that evidence in the search warrant affidavit).

Further, suppression is not warranted because the officers reasonably relied on a valid search warrant supported by probable cause. To be constitutionally valid, "a search warrant must be supported by a showing of probable cause." *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007). Probable cause exists if, based on the totality of the circumstances, a showing can be made "sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). "Probable cause to issue a search warrant exists when an affidavit [or testimony] in support of the warrant sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States. v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (quotation omitted).

The evidence shows officers suspected Defendant was involved in drug trafficking based on information they received from jail calls and her cell phone data. Once officers went to the motel based on ping data, desk staff said Defendant was staying in room 234 and had used an ID with the name "Cady Glaser" to check into the room. An ID with this name on it was in the toilet bowl when officers conducted the sweep of the room. The desk staff told the officers they were planning to evict Defendant that morning due to issues with her showing multiple ID's and using

9

different names while renting rooms. Officers also had information Defendant was driving a stolen vehicle. Further, the officers knew Defendant was on probation and that the terms of her probation included a search clause. This information, along with information regarding the methamphetamine pipe and firearm in the safe, was all contained in the affidavit offered in support of the search warrant. Thus, the search warrant was supported by probable cause and valid.

Further, even assuming the warrant was invalid, the evidence is nonetheless admissible. "Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). A "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (quotation omitted). An officer's reliance on a warrant may be said to be objectively unreasonable in four circumstances: (1) when the affidavit supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for the truth, thus misleading the issuing judge; (2) when the judge issuing the warrant "wholly abandoned his judicial role;" (3) "when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant;" and (4) when the warrant is "so facially deficient" that no police officer could reasonably interpret the warrant as valid. *Puckett*, 466 F.3d at 630. None of these circumstances are present here. The undersigned concludes the officers' reliance upon the warrant was objectively reasonable and the evidence should not be suppressed.

Moreover, the officers also had authorization to search the motel room based on the search clause contained in Defendant's probation order. In *United States v. Knights*, 534 U.S. 112, 121 (2001), the Supreme Court concluded that when a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that condition without a warrant based upon that officer's reasonable suspicion that the probationer is violating his probation's terms. The Supreme Court reasoned that a warrantless search of a probationer's house requires no more than reasonable suspicion because a probationer has "significantly diminished privacy interests." *Id*. at 121-22. Here, for the reasons explained above, the officers had

10

reasonable suspicion that Defendant was violating the terms of her probation. Therefore, on this additional basis, suppression is not warranted.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 22) be denied.

Dated this 6th day of January, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.